## Hyatt, receiver, &c. vs. Wait and Simmons.

37 29
84h 611

37b 29
62ad462

A clause in a policy of insurance providing that the interest of the assured in the policy, or in the property insured, is not assignable without the consent of the insurers, in writing; and that in case of any transfer or termination of such interest without such consent, the policy shall thenceforth be void and of no effect, is to be regarded as a provision made for the exclusive benefit of the company, and to be practically exercised by them or not, at their option.

If, after the assured has transferred his interest in the policy and in the property insured, without the written consent of the company, the company choose to ratify the transfer, and, notwithstanding the transfer, to continue the insurance, the policy will not be absolutely void. Miller, J. dissented.

And if, after notice of such transfer, they treat the assignee as a member of the company they will be *estopped* from denying such ratification and approval.

Whether a policy of insurance be regarded as originally void, or only voidable, in consequence of an unauthorized transfer, it is nevertheless conditionally susceptible of ratification and confirmation.

Notwithstanding a policy be regarded as absolutely void, by reason of an unauthorized transfer, so far as to prevent an action for a loss by the assured, against the company, the former is not released from the obligations of his deposit or premium note until he has complied with a condition of the policy and charter, requiring " the payment of his proportion of all losses and expenses that may have accrued prior to the surrender " of the policy, or alienation of the property.

The assured will remain liable upon his deposit note, as well for losses occurring after as before the alienation, until all assessments are paid. Miller, J. dissented.

For a proper understanding of the rights and obligations of the parties, the *charter* of a mutual insurance company, a *policy* issued by the company, and the *conditions* annexed thereto, must be read together. The result will be, 1. That a sale cannot take place without the consent of the company. 2. That the assured cannot terminate his membership in the company, nor be released from the obligations of the premium note, without paying up all arrears of assessments for losses previously incurred. 3. That the purchaser must be one whose purchase has been made with the consent of the company, or has been ratified and approved by them. 4. That the purchaser must be a different person from the parties insured, or either of them. In other words, the sale must be to a third person, and not to one of the assured. The *entire* interest must be transferred to some one who was not interested in it previously.

Notwithstanding a clause in the charter of a mutual insurance company, declaring that all persons who shall insure with the company, and their heirs, &c., " *so long as they shall be insured* in said company, shall be and con-

tinue *members* thereof, and *no longer*," persons insured are still members of the company, and liable to contribute for the losses sustained, although they have alienated the property without the written consent of the company.

Upon a recovery on a premium note, for the non-payment of assessments, the plaintiff is entitled to *interest*, from the time when the assessments were payable.

THIS action was brought by the plaintiff as receiver of the Rensselaer Insurance Company, against the defendants, to recover the amount of a premium note for $350, given by them to said company, and dated the 25th day of April, 1850. It was tried by the court, (Judge HOGEBOOM,) without a jury, at the Rensselaer circuit, in February, 1861, upon a statement of facts agreed on, in writing, signed by the attorneys of the respective parties, of which the following is a copy:

"We stipulate to admit on the trial of this action the organization and reorganization of the Rensselaer Insurance Company; the appointment of the plaintiff as receiver of the same; the execution of the note by the defendants; the execution and delivery of the policy of insurance by the company to the defendants, who were at that time copartners; the making of the assessment; the regularity of the same, and publication of notice of and demand of the same of the defendants, as alleged in the complaint. Also, that on the 17th day of May, 1852, Thomas Simmons sold his interest in the insured property to the defendant William G. Wait, and executed the assignment on the policy to Wait, and that on the same day he wrote a letter to the secretary of the company, which is hereto annexed; that said letter inclosed the policy; that the secretary answered, declining giving consent unless the assessments were paid, as stated in the memorandum at the foot of the letter. That the policy was found in a bundle of old policies in the office of the company, January 30th, 1857, by the plaintiff, and that the letter of May 17th, 1852, was found in the policy. That the policy was sent to the office of the company the 17th day of May,

1852, with the letter of that date, and remained there till January 30th, 1857. That at the time, May 17th, 1852, there was an assessment of $17.21 on the note in suit, made July 27th, 1851, which had not been paid, and has never since been paid. That the assessments mentioned in the complaint were made for losses which accrued subsequently to January 13th, 1853. That there were some losses intermediate the 27th July, 1851, and May 17th, 1852, towards the payment of which the note in suit had not and has never since contributed. Dated February 4th, 1861."

The following is a copy of the letter of Wait to the secretary of the company, referred to in the above stipulation:

"*Vail's Mills, May* 17, 1852.

J. RANSOM, ESQ.: Will you have the goodness to approve of the assignment of the interest of the policy inclosed, to me, as I have purchased his interest of the property mentioned in the policy inclosed. I have also procured an additional insurance on stock and bark, both in and out of the tannery, of $1000. Will you have the goodness to return this policy as soon as convenient. Direct your letter Vail's Mills, Fulton co., N. Y. Yours respectfully,

WILLIAM G. WAIT."

Indorsed, "Declined giving consent unless the assessments are paid. May 20, 1852."

The other exhibits were copies of the policy of insurance with the conditions annexed, the assignment of the same from Simmons to Wait, dated the 17th day of May, 1852, and the charter of the Rensselaer Insurance Company. The court found the facts as contained in said statement and exhibits, and as a conclusion of law decided that the plaintiff was entitled to judgment for the whole amount unpaid of the assessments upon said note, with interest from the time the same became payable as claimed in the complaint. The defendants excepted as follows: "The defendants except, because the court did not decide that the sale of the property by Simmons to Wait, and the refusal of the

company to ratify the sale and the policy, operated to destroy the policy, and to discharge the defendants from all liability on the note for assessments thereon for all losses which might occur after the sale, &c., and the refusal of the company to ratify the same. The defendants except, because the court decided that the defendants were liable to be assessed on the said note for losses after the sale of the property by Simmons to Wait, and after the notification thereof and the refusal of the company to ratify the sale and the policy. The defendants except, because the court did not decide, upon all the facts found, that the plaintiff could not recover; and because the court did not decide that the defendants were entitled to judgment in their favor."

Judgment having been entered on this decision, for the plaintiff, for $444.35 damages and the costs of suit, the defendants appealed to the general term.

*W. Wait,* for the defendants.

*C. F. Tabor,* for the plaintiff.

HOGEBOOM, J. The plaintiff brings this suit to recover of the defendants, as members of the Rensselaer County Mutual Insurance Company, the amount due on a premium or deposit note signed by them for $350, which on its face is payable in such portions and at such times as the directors may require. The complaint alleges a proper assessment for losses incurred, and the neglect of the defendants to pay the same. No question is made but that the plaintiff, in these respects, has made the necessary averments and proof, and is entitled to recover, unless the defense relied on can be sustained.

That defense is, that one of the defendants, Simmons, sold out his interest in the insured property to the other, Wait, without the consent of the company; that the purchaser notified that sale to the company, and by letter requested

their approval of the assignment of the interest in the policy (inclosed) to him, and a return of the policy as soon as convenient; that the company declined giving such consent unless the prior assessments were paid; that the policy never was returned; that such letter was subsequently found by the receiver, with an indorsement on it by the agent of the company declining to give consent unless the assessments were paid, assessments then unpaid having been actually made previous to that time for losses incurred previous to the sale; and that subsequently to the receipt of the indorsement upon said letter, assessments were made for losses thereafter incurred, on account of the non-payment of which this action was brought.

The defendants' legal propositions are: 1st. That by the unauthorized sale the policy became void, and the defendant ceased to be a member of the company; and that assessments for losses can only be made upon and collected of actual members. 2d. That if, by the unauthorized sale, the policy was only voidable at the pleasure of the company, they *elected* to treat it as *void* by not returning the policy as requested in the letter of the defendant Wait, and not acceding to the transfer of the subject insured, mentioned in his letter, except upon conditions not authorized by the charter or the contract between the parties. These are the questions to be examined.

I. By the terms of the policy and conditions annexed, it is unquestionable that the sale of the property insured, without the consent of the company, renders the policy either void or voidable.

The policy provides that " the interest of the assured in this policy, or in the property insured thereby, or in any part thereof, is not assignable without the consent of the said company in writing; and in case of any transfer or termination of such interest, or any part thereof, either by sale or otherwise, without such consent, this policy shall *thenceforth be void and of no effect.*"

This language, it must be conceded, is very strong and explicit, and some authorities hold that nearly similar language makes the policy absolutely void as *against the company*. (*Smith* v. *Saratoga Ins. Co.*, 1 *Hill*, 497. *S. C.*, 3 *id.* 508. *Howard* v. *Albany Ins. Co.*, 3 *Denio*, 301. *Tillou* v. *Kingston Mutual Ins. Co.*, 1 *Selden*, 405.) Nevertheless, I regard it as a provision merely for the exclusive benefit of the company, and to be practically exercised by them or not, *at their option*. (*See Potter* v. *Ontario and Livingston Mutual Ins. Co.*, 5 *Hill*, 147; *Canfield* v. *Westcott*, 5 *Cowen*, 270; *Mancius* v. *Sergeant, Id.* 271; *Church* v. *Ayres, Id.* 272.) There seems to be no good reason why the policy should be absolutely void if the company choose to ratify the transfer, and notwithstanding the transfer, to continue the insurance. And I think if they subsequently treated the defendant as a member of the company, they would be *estopped* to deny such ratification and approval. (*Frost* v. *Saratoga Mutual Ins. Co.*, 5 *Denio*, 154.)

No. 8 of the conditions of the insurance, annexed to the policy, provides that "in case any property insured shall be bona fide sold and conveyed, the insured may surrender the policy and have the same canceled, *upon the payment of his proportion of all losses and expenses that may have accrued prior to such surrender.*" As these conditions were not in any respect complied with, we may safely conclude from this, as well as from the defendant's letter, that no such thing as a surrender or cancellation of the policy was within his contemplation, and this I understand to be conceded by the counsel for the defendants.

Section 9 of the charter provides that "when any property insured by the said corporation shall be alienated by sale or otherwise, the policy thereupon shall be void, and be surrendered to the directors of the said company, to be canceled; and upon such surrender the assured shall be entitled to receive his or her deposit notes, *upon the payment of his or her proportion of all losses and expenses that have accrued prior*

*to such surrender."* The section further provides that "the grantee or alienee having the policy assigned to him or her may have the same ratified and confirmed to him or her, for his or her own proper use and benefit, upon application to the directors, and with their consent, within thirty days after such alienation, on giving proper security to the satisfaction of said directors, for such portion of the deposit or premium note as shall remain unpaid."

From this copious citation from the policy, the conditions annexed and the charter of the company, I think it is sufficiently manifest, 1st. That whether the policy be regarded as originally void or only voidable in consequence of an unauthorized transfer, it is nevertheless conditionally susceptible of ratification and confirmation. 2d. That notwithstanding the policy in the given case be regarded as absolutely *void,* so far as to prevent an action for loss by the assured, against the company, the former is not released from the obligations of his deposit or premium note until he complies with certain conditions, to wit, "the payment of his proportion of all losses and expenses that may have accrued prior to the surrender" of the policy or alienation of the property. (*Conditions No.* 8 ; *charter,* § 9.) This condition has never been complied with or attempted to be, and it would seem, therefore, that the deposit note should remain in full force.

And so are the authorities. In *Neely* v. *The Onondaga Mutual Ins. Co.,* (7 *Hill,* 49,) the court held, under a charter containing a clause identical with the 9th section of the charter above quoted, that a replication setting forth that the defendants, with full notice of the alienation of the subject of the insurance, made and collected of the plaintiff assessments upon the premium note for losses happening after the alienation, furnished no answer to the plea which set up an alienation and thereby a forfeiture of the policy. The court, per Beardsley, J. says, (*p.* 51,) "although the plaintiff's policy became void by the alienation of the property insured, it does not follow that his deposit note was

void. On the contrary, until he surrendered his policy and paid his proportion of all losses which accrued ' prior to such surrender,' *the deposit note remained obligatory upon him.* He does not pretend that he surrendered his policy previous to the assessment mentioned in the replication, and he was therefore *liable to pay his proportion of the losses for which the assessment was made.*" To the same effect is *Huntley* v. *Beecher,* (30 *Barb.* 580.) The court says, (*p.* 584,) " The opinion in the case in 7*th Hill* is in point, showing that although the policy is avoided by the alienation, the assured remains liable upon his note, for losses after the alienation, until he surrenders the policy to be canceled, when he is entitled to his deposit note *upon the payment of all losses and expenses that have accrued prior to the surrender.*"

There is no pretense, in the case at bar, that the policy has ever been surrendered, and there seems to be no question, upon the above authorities, that notwithstanding the policy may be void, the insured nevertheless remains liable upon the deposit note, as well for losses occurring after as before the alienation, until all assessments are paid.

II. The remaining position taken by the defendants is, that if the company had an election to treat the contract either as valid or void, they have made such election, and decided to hold the policy *void.* I am unable to discover the evidence upon which such a conclusion rests.

1st. The company, it may be admitted for the sake of the argument, refused to recognize the validity of the transfer of the property; but this is not necessarily *avoiding* the *policy.* They preferred to let the policy stand as it was, without introducing a new party; or rather, they chose to retain *both* the defendants as members of the company, and signers of the premium note, instead of sanctioning the sale without payment of previous assessments, and accepting one of the defendants as their debtor in the place of both. It is evident they intended to keep things on the old footing and retain the policy as it was, without a change. They there-

fore elected to *continue* both the defendants as members of the company. They certainly were not obliged to part with them against their own will.

2d. This conclusion derives additional force from the practical conduct of the company. They not only held both the defendants for the old assessments, but they imposed the new assessments for subsequently occurring losses, upon both. I think this was an *election* to treat *both* as still members of the company, and that they would be *estopped* to deny that such was the fact. In *Frost* v. *Saratoga Mutual Insurance Co.* (5 *Denio*, 154) it was held, that although the applicant (the plaintiff) had *expressly warranted* that there were no buildings within ten rods of the premises insured, and thereby *avoided* the policy if the warranty was false, yet, inasmuch as the defendants afterwards, with subsequent knowledge of such *falsity* and of the loss, had made *assessments* upon the plaintiff's premium note, they were *estopped* from saying that the plaintiff was not a member of their company, and from avoiding the policy by reason of the false warranty, and were liable for the loss.

3d. I apprehend the defendants could not withdraw from the membership of the company without the plaintiff's consent. The contract was mutual and obligatory upon both, and each had a right to insist on its performance and its obligations. The parties had chosen to agree upon the terms on which a dissolution of the membership could be had. These were, among others, a surrender of the policy, a payment of all assessments in arrear, and a consent on the part of the company to a parting with the old, and to the introduction of a *new*, member into the society. Not one of these conditions had been complied with or waived, and I think the membership continued.

4th. At all events there was evidence in the case from which the court below might fairly infer, and as we must presume did infer, a continuance of the membership; and there is no preponderance of evidence the other way which

authorizes us to overthrow the result at which that tribunal arrived on this question of fact.

5th. The argument of the defendant's counsel seems to be that inasmuch as the charter declares the policy *void* in case of an unauthorized alienation, the legal presumption is— even if void means voidable—that the company have *avoided* the policy, and that affirmative evidence is necessary to show that the company by some express and positive act have *continued* the policy. I have attempted to show that this position is unsound, but that even if sound, such affirmative evidence at least of qualified continued membership is not wanting in this case.

It is further claimed that the company manifested their intent to avoid the policy by refusing to ratify the sale, and by insisting on the payment of the assessment in arrear, as a condition of ratifying the policy. This is a misstatement of the language and acts of the company. They refused, except on certain conditions, to ratify the sale, but not for the purpose of avoiding the policy, but continuing it and preventing a change. They insisted on the payment of $17.21 for the assessment in arrear, not as a condition of ratifying the existing policy, but as a condition of changing it, releasing one of the old members and accepting the individual instead of the partnership. It is this misconstruction of the grounds taken by the insurance company, which leads, I think, to the fallacy of the defendant's argument.

It is supposed on the part of the defendants that there are two classes of cases to which the before recited provisions of the policy, with the conditions annexed and of the charter, apply ; to wit : 1. Where the application is to surrender and cancel the policy on a sale of the property ; 2. Where the application is to continue and renew it to the purchaser on alienation of the property.

In a partial and limited sense, this is true. The charter and the conditions annexed to the policy both secure to the

assured, in case of a sale of the property, the right to surrender and cancel the policy and to receive back his premium or deposit note, *upon payment of his proportion of all losses and expenses previously accrued.* And when this is all that is desired and these conditions are complied with, no doubt the policy ceases, and any attempt to impose upon the party assessments for future losses would be of no avail. The contract has been terminated, and the party originally insured is no longer a member of the company.

The charter and the aforesaid conditions also provide that the purchaser or alienee may, on certain conditions, take an assignment of the policy and have the same ratified and confirmed to him. As to what these conditions are, I do not think the conditions annexed to the policy and the charter entirely agree. By the former, as I understand them, the purchaser is entitled to come in, take an assignment of the policy, and have the same ratified and confirmed to him *upon his signing the premium note.* By the latter, the purchaser is entitled to the same rights and privileges *on application to the directors, on obtaining their consent, and on giving proper security* for the unpaid portion of the premium or deposit note. In this apparent want of harmony between these different instruments, it is well enough to turn to the body of the policy and examine *its* provisions. We there find that no sale or assignment of the interest of the assured in the property insured can be made *without the consent of the company in writing.* For a proper understanding of the rights and obligations of the parties we must, I think, read these three several instruments *together*, and as throwing light upon each other. And, thus read, I think we may arrive at these conclusions:

1. That a sale cannot take place without the consent of the company.

2. That the assured cannot terminate his membership in the company, nor be released from the obligations of the pre-

mium note, without paying up all arrears of assessments for losses previously incurred.

3. That the purchaser must be one whose purchase of the subject of insurance has been made with the consent of the company, or has been ratified and approved by them.

Such are the express provisions of the charter and of the body of the policy. And although the condition (No. 8) annexed to the policy leaves this matter somewhat in confusion, I think the phrase, "the purchaser of any property *so* sold and conveyed," implies this; for "so sold and conveyed" must either mean sold and conveyed *bona fide*, or else sold and conveyed under circumstances where the vendor has paid up all arrears of assessments. And the words in the same connection, "may take an assignment of *the* policy," must refer to the policy mentioned in the previous part of the same condition, to wit, one upon which the alienor has paid up all arrears of assessment for loss. When this is done, it may well be said or inferred that it is an assignment *with the consent* of the company. Again, it is very questionable whether the company ever intended or can be compelled to recognize any *purchaser,* except one who purchased with their *consent.* Assuredly they never intended that any person should become a *purchaser* and thus a member of their company, in whose *integrity and responsibility* they could not confide. They had this right of choice—one indispensable to their own safety and reputation as an insurance company—in granting or refusing the original application for insurance. And I do not think they ever meant to surrender it in case of an alienation of the property, or to have a dishonest, fraudulent or knavish member foisted upon them without their consent.

4. I think, further, that the fair construction of the contract is, that the *purchaser* must be a different person from the parties insured or either of them; in other words, that the sale must be to a *third person*, and not to one of the assured. It can scarcely be said that the *insured* assigns the

policy or alienates the property when only one of them assigns or alienates it, or, which is the same thing in effect, when two persons insured assign or alienate to one of their own number. The assignment and alienation contemplated a transfer of the *entire* interest to some one who was not interested in it previously.

With this explanation of what the parties contracted and what it was lawful for them to do, let us see what the defendant Wait applied for to the company. Being one of the parties originally insured, and having with his copartner Simmons signed the premium or deposit note, and having purchased of his copartner his interest in the property insured, he writes to the insurance company or their secretary asking them to approve of the assignment of the interest in the policy inclosed, to him, as such purchaser. They answered, declining to give such consent unless the assessments were paid. *Now* it is said for the first, (for the cause was argued at the circuit upon entirely different grounds,) that Wait did not apply for a surrender or cancellation of the policy, but for an approval or consent to its assignment to him. This is true. This was the application. It was refused. The company had a right to refuse it. Their *consent* was asked, and it was, as we have endeavored to show, rightfully withheld at their election. They were not obliged to consent. In the next place *Wait* applied for it, who, as one of the insured, had no right to ask it. Again ; Wait did not offer or propose to give his own premium note. It is said this was unnecessary, because his own name appeared on the premium note originally given. But the company had a right to a new premium note as evidence of the new transaction, and they had a right to hold the old one in addition, at least until all arrearages were paid. The company had a right either to a cumulative or substituted security. They got neither, and neither were offered. It is said they put their refusal to consent upon an untenable ground. I think

not. But as the defendants were actors in that transaction, and were, or at least now are, endeavoring to get rid of a note which was perfectly valid against them, it belonged to them to make such a demand and such an offer to the company as would have made the latter wrongdoers in retaining the note. Nothing of this was ever done. The defendants have made no proper application either to get rid of the old note, or to procure the company's consent to the assignment of the policy. The note was therefore rightfully retained; the assessments were properly made; and this suit is well brought. The company had a right to hold the defendants upon the note; to treat them as members of the company; to make assessments for losses during such membership; and to refuse to sanction an alienation of the property or an assignment of the policy, until all arrearages were paid, and until an eligible substitute was presented for their acceptance, in the place of the parties originally liable.

III. The most serious difficulty which the plaintiff has to meet, in the case, appears to me to arise from the 12th section of the charter, which is as follows: "All persons who shall insure with the said company, and also their heirs, executors, administrators and assigns, *so long as they shall be insured* in said company, shall be and continue *members* thereof, and no longer." It is said that the sale of the premises insured, without the consent of the company, has avoided the policy—has prevented a recovery by either of the defendants in case of loss or damage by fire; and that therefore they are no longer insured, and hence no longer members of the company, nor liable to contribute for losses incurred. But I think, notwithstanding this section, that they are members of the company; that they cannot cease to be members by their own volition, without complying with the terms of the contract, upon which membership is to cease; that there is at least a qualified membership, for the purpose of compelling the payment of the deposit notes, and all assessments

for losses legally imposed, for the purpose of enforcing the obligations of the contract; and that whether or not they are *members* of the company in the strict and technical sense of the term, they are not by their own wrongful act released from engagements which they have undertaken to fulfill. I think, therefore, this section must be understood in a qualified sense, as not entitling them to assert and exercise the rights and privileges of members, except during the period that they shall be insured in the company; and that the section was intended for the benefit and protection of the company, and faithful and paying members, and not of delinquents and wrongdoers. Moreover the words, "so long as they shall be insured in said company," are susceptible of the interpretation "so long as they shall have or so long as there shall be an existing and valid policy in said company"— a policy valid for any purpose, duly issued in the first place, and never surrendered—a policy which is not merely null and void—a policy, upon some of the provisions of which a right of action can be enforced as an existing contract between the parties. Thus interpreted, the rights of all parties can be preserved, and full and exact justice done.

IV. Finally, it is insisted that the judgment is erroneous for including *interest* on the premium note, under the authority of *Bangs* v. *McIntosh,* (23 *Barb.* 591.) This point is now made for the first time, without even an exception to the decision of the court below upon that ground.

But I think interest is recoverable. The case in 23 *Barb.* was an attempt to enforce the whole premium note ($480) with interest, as a penalty for a default in paying a trifling assessment, ($6.10.) In the case at bar the suit is brought to recover only the amount of the assessments for losses actually incurred, and interest is charged from the period when the assessments were payable. I see nothing either illegal or inequitable in such a proceeding.

I think there was no error in the disposition of this cause

in the court below, and that the judgment of the circuit court should be *affirmed.*

PECKHAM, J. concurred in the result of the foregoing opinion.

MIILER, J. dissented.

Judgment affirmed.

[ALBANY GENERAL TERM, March 3, 1862. *Hogeboom, Peckham* and *Miller,* Justices.]